1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JAMIE FOX,                                                    No. CV 11-04820 EDL

        Plaintiff,                                         **ORDER GRANTING MOTION FOR
                                                                    SUMMARY JUDGMENT**

  v.

ERIC K. SHINSEKI, SECRETARY OF THE
DEPARTMENT OF VETERANS AFFAIRS

        Defendant.
_____/

      Plaintiff sued her former employer alleging that she was terminated in retaliation for having

opposed the harassment of a co-worker.  Pending before the Court is Defendant's motion for

summary judgment.  (Dkt. 145.)  Because no reasonable jury could find that Plaintiff engaged in

protected activity or that her termination was a pretext for retaliation, the Court grants Defendant's

motion for summary judgment.

**I.**     **Factual Background**

      A.     <u>Plaintiff's Duties</u>

      On November 25, 2007, Plaintiff Jamie Fox was hired as a Veterans Service Representative

("VSR") in the Department of Veterans Affairs Oakland Regional Office.  (Carradero Decl. Ex.

A-1.)  As a new employee, Plaintiff was required to serve a one-year probationary period.

(Carradero Decl. Ex. A-1.)  Plaintiff was assigned to a "Post-Determination" Training Team under

the supervision of Kimberly Yarbrough.  (Pennington Decl. ¶ 13.)  Other team members included

Lillian Williams and TK.[1]  The Post-Determination Team is responsible for processing veteran

claims, promulgating rating decisions made by others, and preparing notification letters, but it is not

---

[1] Because the parties stipulated to abbreviate the name of Plaintiff's co-worker as TK and his full
name is not relevant, the Court does so.

1   responsible for developing claims requiring a rating decision. (Pennington Decl. ¶ 8.) Plaintiff's

2   duties initially consisted of basic, entry level tasks. (Yarbrough Decl. ¶ 8) In the two months after

3   Plaintiff started work, Plaintiff attended training sessions. At these sessions, Plaintiff was trained on

4   various systems but was "not trained on how to develop rating claims for medical evidence,

5   determine whether medical evidence supported a claim, verify stressors, ascertain whether a claim

6   file  was 'ready to rate,' or whether a rating decision was decided correctly on the merits."

7   (Yarbrough Decl. ¶ 9; Pennington Decl. ¶ 16.) The files Plaintiff was given to work on were

8   pre-screened for trainees and consisted of basic denials or grants of claims previously reviewed by

9   other teams. (Yarbrough Decl. ¶ 11; Carradero Decl. Ex. G, Cuevas Test. at 810-811.)

10          B.      Plaintiff's Complaints About TK's Behavior

11          The events giving rise to this lawsuit began in December 2007. While at lunch, Plaintiff

12   asked her co-worker Williams if she knew the nationality of the cafeteria workers. Williams said she

13   should ask TK, who is of Japanese descent. TK heard this comment, took offense, and began

14   mimicking a Southern accent (Williams is from the South). (Carradero Decl. Ex. E, Pl.'s Test. at

15   21-23.) Plaintiff felt that TK was mocking Williams for being a redneck or racist. (Id. at 24.)

16          After this incident, Plaintiff began to notice more workplace incivility between TK and

17   Williams and felt that TK was campaigning against Williams. (Carradero Decl. Ex. D, Pl.'s Test. at

18   114.) According to Plaintiff, there was tension between the two and people stopped talking to

19   Williams. (Id. at 119, 120). Plaintiff also described a situation in Little Rock involving a

20   competitive training game. The participants were arguing about how many points their respective

21   teams should get, and Williams argued on behalf of her team. After she did, a woman who was a

22   friend of TK's, referring to Williams, commented that: "Ooh, she's the type of girl that you take in

23   the locker room, wrap them in a towel and beat." (Carradero Decl. Ex. M, Pl.'s Dep. at 21-30,

24   quotation at 22.) After returning to Oakland from the training in Little Rock, Plaintiff told Williams

25   about this remark and "pushed" her to go to Yarbrough. (Id. at 29-30). According to Plaintiff, TK

26   also acted rudely toward Williams by rolling his eyes when she spoke and making facial gestures at

27   her behind her back. (Id. at 35-37.)

28          In February 2008, Williams submitted a document to Yarbrough, titled "Harassment and

United States District Court
For the Northern District of California

1   Hostile Work Environment." (Pl.'s Decl. Ex. CE-18 at 3 (referring to earlier submitted document).)
2   This document describes TK's behavior toward Williams and indicates that Plaintiff was present at
3   many of the events. (Carradero Decl. Ex. F, Yarbrough Test. at 419-25.) Williams claimed that
4   TK's attitude must have been caused by homophobia. (Pl.'s Decl. Ex. R, Yarbrough Test. at 6;
5   Carradero Decl. Ex. F, Yarbrough Test. at 414-16.) Although Yarbrough did not initially consider
6   Williams' document to be an EEO complaint, Yarbrough was concerned with Williams' allegations
7   because Williams is a lesbian, and Yarbrough was under the impression that she was therefore a
8   member of a protected EEO class. (Pl.'s Decl. Ex. CE-27, Yarbrough Test. at 2; Carradero Decl. Ex.
9   F, Yarbrough Test. at 416.) Yarbrough forwarded Williams' document to her supervisors, and
10  including Lynn Flint, Director of the Oakland Veteran Benefits Administration Regional Office.
11  Flint thought the problems between TK and Williams were based on two individuals who "just
12  clashed big time" and were based on spite, but "not necessarily harassment as we would define under
13  EEO." (Carradero Decl. Ex. G, Flint Test. at 646.) At the same time, Flint was concerned that the
14  document raised claims of harassment based on Williams' sexual orientation and thought the incident
15  in the lunch room arguably implicated race, though it is not clear whether she thought the
16  lunch-room situation implicated Williams' race or TK's. (Id. at 643-648.)

17      Plaintiff met with Yarbrough about TK's treatment of Williams on February 28, 2008.
18  (Carradero Decl. Ex. AE-8.) The same day, Plaintiff emailed Yarbrough about TK rudely ignoring
19  Williams. (Carradero Decl. Ex. CE-5.) On May 5, 2008, Plaintiff emailed Yarbrough about more
20  rude behavior on TK's part that Plaintiff believed created a hostile work environment for Williams.
21  Specifically, Plaintiff mentioned that TK made faces behind Williams' back when she was speaking.
22  She also asserted that someone kept moving a recycling box Plaintiff made. (Carradero Decl. Ex.
23  CE-6.) Plaintiff later emailed Yarbrough about a situation where Plaintiff raised her voice to TK
24  because he was frustrating Plaintiff's search for a file by not answering Plaintiff's questions.
25  (Carradero Decl. Ex. CE-9; Ex. E, Pl.'s Test. at 52-57.) On May 29, 2008, Plaintiff emailed
26  Yarbrough to complain about TK's presence in her cubicle and her co-workers making jokes about
27  the incident where she "blew up" at TK. Plaintiff stated in her email that "[t]his is a form of
28  harassment when he does this and if he continues I will make a formal complaint against him."

3

1  (Carradero Decl. Ex. CE-9.)  Yarbrough did not think this email was a formal EEO complaint but
2  she did expect Plaintiff to speak with the EEO officer, and Yarbrough forwarded the email to the
3  EEO liaison, Henry Newton.  (Carradero Decl. Ex. F, at 333-36.)

4          C.      The Roundtree File

5          Approximately a month after Plaintiff started at Veterans Affairs, she began working on the
6  claim file of veteran Hosea Roundtree.  (Carradero Decl. Ex. A, Pl.'s Dep. at 142.)  The rating
7  decision for the claim was a denial.  (Carradero Decl. Ex. A-19.)  According to Plaintiff, she
8  received the file as part of her training on how to use the Vetsnet system to promulgate an award or
9  denial of a claim, and she was supposed to familiarize herself with the file and make sure things were
10 correct.  (Carradero Decl. Ex. A, Pl.'s Dep. at 144.)

11         Upon reviewing the file, Plaintiff noticed a yellow piece of notebook paper in the file from
12 Richard Jackson of New Directions, a medical provider, stating that he could not provide any
13 information about Roundtree.  (Carradero Decl. Ex. A, Pl.'s Dep. at 150-51, Ex. A-18, A-20.)
14 Plaintiff subsequently called New Directions and faxed New Directions on official letterhead
15 requesting personal medical information about Roundtree.  (Carradero Decl. Ex. A, Pl.'s Dep. at 179,
16 Ex. A-21.)  Plaintiff enclosed with this fax Roundtree's authorization and consent to release medical
17 information.  (Carradero Decl. Ex. A-21.)  Plaintiff followed up with another fax on January 14,
18 2008 and left New Directions a voice mail.  (Carradero Decl. Ex. A-29.)  She continued to contact
19 New Directions via fax and phone regarding the Roundtree file later in January.  (Carradero Decl.
20 Ex. A-30, Ex. A-31.)

21         Plaintiff also conducted internet research relevant to Roundtree's claim.  (Carradero Decl. Ex.
22 A-32, Ex. A, Pl.'s Dep. at 214-230.)  Plaintiff printed material from websites such as nytimes.com
23 and Wikipedia.org about post-traumatic stress disorder and the ship on which Roundtree had served.
24 (Carradero Decl. Ex. A-32.)  Plaintiff testified that she did not perform this research on work time.
25 (Carradero Decl. Ex. A, Pl.'s Dep. at 217.)  Plaintiff also drafted a memo directed to "Whom It May
26 Concern" regarding what she considered to be discrepancies in Roundtree's file, namely
27 unprofessional and incomplete correspondence from New Directions and insufficient evidence in
28 support of the denial of Roundtree's claim.  (Carradero Decl. Ex. A-33.)

4

1    After performing this research, Plaintiff prepared to leave for training in Little Rock.

2 Plaintiff testified that she showed the file and her research to a supervisor, Dennis Uldricks, who told

3 her to leave the file on her desk while she was at training. (Carradero Decl. Ex. E, Pl.'s Test. at

4 129-132.) Uldricks, however, does not recall any such discussion or instructions and testified he

5 would not tell someone to leave a file to sit. (Carradero Decl. Ex. G, Uldricks Test. at 769-772). In

6 any event, Plaintiff did leave the file on her desk for three weeks while she was at training, and it was

7 still there when she got back. (Carradero Decl. Ex. E, Pl.'s Test. at 131-132.)

8    In February 2008, Plaintiff again called and faxed New Decisions seeking Roundtree's

9 medical records. (Carradero Decl. Ex. A-34.) At this point she learned that Roundtree's file already

10 contained the medical files for which she had been searching. (Carradero Decl. Ex. A, Pl.'s Dep. at

11 282-83.) She spoke with Uldricks, who told her to take the file to Sherb Carlson. (Id. at 283).

12 Plaintiff went over the file with Carlson. (Id. at 283-84.) Eventually, the file was promulgated by

13 another employee in April 2008. (Carradero Decl. Ex. G, Pennington Test. at 726-728.) Plaintiff

14 tried to recall the file around May 20, 2008 and directed that the file go to Williams. (Carradero

15 Decl. Ex. F, Yarbrough Test. at 337-338.) On May 22, 2008, the file was brought to Yarbrough's

16 attention for the first time. (Id. at 347-48; Ex. G, Pennington Test. at 731-32; Yarbrough Decl. ¶¶

17 12-13.)

18    D.    Plaintiff's June 5, 2008 Termination

19    Upon learning of Plaintiff's actions with regard to the Roundtree file on May 22, 2008,

20 Yarbrough contacted her supervisor, Pennington. (Yarbrough Decl. ¶ 14; Pennington Decl. ¶ 27;

21 Carradero Decl. Ex. F, Yarbrough Test. at 355.) Yarbrough and Pennington went through the file

22 and began discussing terminating Plaintiff. (Yarbrough ¶ 14; Pennington Decl. ¶ 27; Carradero Decl.

23 Ex. F, Yarbrough Test. at 353.) Pennington asked Yarbrough to speak with Plaintiff about what she

24 did with the Roundtree file because Pennington was concerned that Plaintiff knew Roundtree

25 personally. (Yarbrough Decl. ¶ 14; Pennington Decl. ¶ 28.) Pennington also immediately contacted

26 her supervisor, Willimon, to notify her about the Roundtree file. (Pennington Decl. ¶ 27.) Based on

27 what Willimon heard from Pennington, she expressed to Pennington that Plaintiff should be

28 terminated. (Pennington Decl. ¶ 28; Willimon Decl. ¶ 9.)

5

1    On May 23, 2008, Yarbrough met with Plaintiff to discuss the Roundtree file. (Yarbrough
2    Decl. ¶ 16.) On either May 27 or May 28, 2008, Pennington and Director Flint discussed the
3    possibility of terminating Plaintiff. (Pennington Decl. ¶ 29; Carradero Decl. Ex. G, Pennington Test.
4    at 732.) According to Pennington, Flint indicated that she agreed with termination generally and that
5    Pennington and others were to decide the final charges to recommend to Flint. (Id.) Similarly, Flint
6    avers that at some time either immediately before or after Memorial Day weekend (May 24, 2008 to
7    May 26, 2008) she stopped by Pennington's office and spoke with Pennington and Yarbrough about
8    the Roundtree file. (Flint Decl. ¶ 11; Carradero Decl. Ex. F, Yarbrough Test. at 355.) They showed
9    Flint one of the faxes that Plaintiff sent to New Directions soliciting medical records and which
10   contained Plaintiff's personal cell phone number. Yarbrough and Pennington told Flint there would
11   be a "possibility that they would be requesting termination." (Flint Decl. ¶ 11; Carradero Decl. Ex.
12   G, Flint Test. at 666.) Flint agreed that they should be considering termination and told them to
13   gather more information. (Id.; Carradero Decl. Ex. G, Flint Test. at 670.)

14   As of May 28, there was unanimous agreement to recommend Plaintiff's termination to Flint.
15   (Pennington Decl. ¶ 29; Yarbrough Decl. ¶ 16; Carradero Decl. Ex. F, Yarbrough Test. at 358.)
16   Yarbrough and Pennington agreed that Plaintiff would be charged with failure to follow instructions
17   regarding the claim file as well as a privacy violation. (Pennington Decl. ¶ 30.) Yarbrough,
18   Pennington, and Willimon then discussed the documents that needed to be submitted to Human
19   Resources and Flint, who had final termination authority. (Yarbrough Decl. ¶ 17, Pennington Decl. ¶
20   30; Willimon Decl. ¶¶ 3, 10.) On May 29, 2008, Yarbrough drafted a memorandum regarding
21   removal charges for failure to follow instructions and a privacy violation. (Carradero Decl. Ex.
22   AE-16.) The memorandum recommended Plaintiff's discharge. (Carradero Decl. Ex. AE-16.)
23   Also on May 29, 2008, Plaintiff emailed Yarbrough about potentially filing a formal complaint
24   against TK. (Carradero Decl. Ex. CE-9.) Yarbrough forwarded this email to several other
25   management employees, stating:

26       I don't mean to bother you all, but I just wanted to give you all a heads up (see below).
         Ms. Fox intends to file a complaint against [TK] eventually. I did speak to Uli
27       [Willimon] yesterday, and once I receive the memo from Tina, I will put together a
         package so we can move forward with proposing to remove Ms. Fox, as that is Uli's
28       intent.

6

1   (Id.)[2]  Flint was not copied on this email, and she "was not aware Plaintiff had communicated to Ms.

2   Yarbrough that she would file a formal complaint against the male co-worker." (Flint Decl. ¶ 10.)

3          By May 30, 2008, Flint had decided to terminate Plaintiff, and she met with Human

4   Resources on that date to discuss the logistics of Plaintiff's termination. (Flint Decl. ¶ 13.)  Flint

5   decided that there was insufficient evidence to charge Plaintiff with a privacy violation. (Flint Decl.

6   ¶ 14.)  After May 30, Yarbrough, Pennington, and Human Resources continued to discuss the

7   termination letter and how to classify Plaintiff's actions. (Yarbrough Decl. ¶ 19; Pennington Decl. ¶

8   33; Flint Decl. ¶ 13.)

9          On June 5, 2008, Williams filed a complaint with the EEO liaison. (Pl.'s Decl. Ex. Q-2.)  On

10  June 13, 2008, both Williams and Plaintiff received termination letters. (Carradero Decl. Ex. C-8;

11  Pl.'s Decl. Ex. AE- 7.)  Plaintiff's termination was based on failing to follow instructions regarding

12  the Roundtree file and not meeting performance goals. (Carradero Decl. Ex. C-8.)  Plaintiff resigned

13  in lieu of termination on June 23, 2008.

14          E.     Plaintiff's Administrative Proceedings

15          Plaintiff filed an administrative EEO complaint alleging that she was terminated in retaliation

16  for her serving as a witness for Williams.  After an administrative hearing, the Administrative Law

17  Judge issued an order finding that Plaintiff failed to prove that Veterans Affairs retaliated against her

18  on the basis of EEO activity.  The ALJ presumed that Plaintiff made out a prima facie case of

19  retaliation but found that Veterans Affairs presented  compelling reasons for terminating Plaintiff

20  and Plaintiff did not establish that these reasons were a pretext for retaliation. (Carradero Decl. Ex.

21  L.)

22  **II.    Discussion**

23          A.     Plaintiff's Withdrawal of Claim for Sex Discrimination and Defendant's Motions to
                  Strike
24
           Plaintiff filed a complaint alleging retaliation and sex-based discrimination.  Defendant has
25
    now moved for summary judgment, and Plaintiff opposes the motion.  In Plaintiff's opposition, she
26
    conceded that she is no longer pursuing a claim of sex discrimination and is only proceeding on her
27

28
           [2] The "Tina" mentioned in this email is Tina Mottram, a privacy officer. (Carradero Decl. Ex.
    F, Yarbrough Decl. at 355.)

United States District Court
For the Northern District of California

1 claim of retaliation. (Pl.'s Opp. at 17.) The Court therefore grants Defendant's motion for summary
2 judgment regarding sex-discrimination.

3      Defendant also moves to strike Plaintiff's declaration on a number of grounds. Although
4 there are problems with Plaintiff's declaration in that it contains impermissible argument, hearsay,
5 and facts not within Plaintiff's personal knowledge, Defendant has not demonstrated which parts of
6 the declaration should be stricken and why. In any case, the Court has not relied on any
7 objectionable portions of the declaration. Accordingly, the Court denies Defendant's motion to strike
8 Plaintiff's declaration in its entirety.

9      The Court grants, however, Defendant's motion to strike Plaintiff's argument on the merits in
10 the form of pages 1-13 and 15 of Plaintiff's objections to Defendant's reply (Dkt. 153), except as to
11 page 14, lines 3-25. The remainder of Plaintiff's objections do not comply with the Local Rule 7-3
12 and constitute an impermissible sur-reply.

13     B.    Summary Judgment Standard

14      Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on
15 file, and any affidavits show that there is no genuine issue as to any material fact and that the movant
16 is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may
17 affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A
18 dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a
19 verdict for the nonmoving party. Id. The court must view the facts in the light most favorable to the
20 non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts.
21 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must not
22 weigh the evidence or determine the truth of the matter, but only determine whether there is a
23 genuine issue for trial. Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

24      A party seeking summary judgment bears the initial burden of informing the court of the
25 basis for its motion and of identifying those portions of the pleadings and discovery responses that
26 demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317,
27 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively
28 demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue

United States District Court
For the Northern District of California

1    where the nonmoving party will bear the burden of proof at trial, the moving party can prevail by

2    pointing out to the district court that there is an absence of evidence to support the nonmoving party's

3    case. Id. If the moving party meets its initial burden, the opposing party "may not rely merely on

4    allegations or denials in its own pleading"; rather, it must set forth "specific facts showing a genuine

5    issue for trial." See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250. If the nonmoving party

6    fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a

7    matter of law." Celotex, 477 U.S. at 323.

8         A party asserting that a fact is genuinely disputed must support the assertion by citing specific

9    admissible evidence, including depositions, documents, or declarations. Fed. R. Civ. P. 56(c)(1)(A);

10   FTC v. Publishing Clearinghouse, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory,

11   self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a

12   genuine issue of material fact."). Speculation does not suffice to create a genuine factual dispute on

13   summary judgment. Nelson v. Pima Community Coll., 83 F.3d 1075 (9th Cir. 1996). Any

14   declaration used to support or oppose a motion "must be made on personal knowledge, set out facts

15   that would be admissible in evidence, and show that the affiant or declarant is competent to testify on

16   the matters stated." Fed. R. Civ. P. 56(c)(4).

17        C.    Retaliation

18             1.    *Legal Standard*

19        A prima facie case of retaliation requires the plaintiff to show that: (1) she engaged in a

20   protected activity; (2) she suffered a materially adverse action; and (3) there was a causal relationship

21   between the two. Westendorf v. W. Coast Contractors of Nev., Inc., 712 F.3d 417, 421 (9th Cir.

22   2013). An employee engages in protected activity when she opposes an employment practice that

23   either violates Title VII or that the employee reasonably believes violates that law. See Freitag v.

24   Ayers, 468 F.3d 528, 541 (9th Cir. 2006). A materially adverse action exists when the challenged

25   action well might have dissuaded a reasonable person from making or supporting a charge of

26   discrimination, such as an undeserved poor performance rating. Emeldi v. Univ. of Oregon, 698

27   F.3d 715, 726 (9th Cir. 2012) (quoting Burlington N. & Santa Fe Ry. Co.  v. White, 548 U.S. 53, 68

28   (2006)).

9

1    The Supreme Court recently held that "Title VII retaliation claims must be proved according
2 to traditional principles of but-for causation," requiring "proof that the unlawful retaliation would not
3 have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of
4 Texas S.W. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2533 (2013).  On summary judgment, causation
5 "may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff
6 engaged in protected activities and the proximity in time between the protected action and the
7 allegedly retaliatory employment decision."  Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018,
8 1035 (9th Cir. 2006) (quoting Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987)).
9 Nevertheless, a plaintiff "must make some showing sufficient for a reasonable trier of fact to infer
10 that the defendant was aware that the plaintiff had engaged in protected activity."  Raad v. Fairbanks
11 N. Star Borough School Dist., 323 F.3d 1185, 1197 (9th Cir. 2003).  Further, "mere speculation
12 cannot raise an issue of fact."  Emeldi, 698 F.3d 728.

13    Once a plaintiff produces evidence supporting a prima facie case, the burden shifts to the
14 defendant employer to articulate a legitimate, non-retaliatory reason for the adverse employment
15 action.  If the employer does so, the plaintiff bears the burden of demonstrating that the reason was
16 merely a pretext for the unlawful retaliatory motive.  See Stegall v. Citadel Broad. Co., 350 F.3d
17 1061, 1066 (9th Cir. 2003).  In this step, the plaintiff "must do more than establish a prima facie case
18 and deny the credibility of the [defendant's] witnesses."  Schuler v. Chronicle Broadcasting Co., 793
19 F.2d 1010, 1011 (9th Cir. 1986).  Rather, he or she must offer "specific and significantly probative
20 evidence" that the proffered reasons are a pretext.  Id.  A plaintiff can show pretext "either directly
21 by persuading the court that a discriminatory reason more likely motivated the employer or indirectly
22 by showing that the employer's proffered explanation is unworthy of credence."  Texas Dep't of
23 Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

24    2.    *Protected Activity*

25    In order to survive summary judgment, Plaintiff must show that there is a genuine issue of
26 disputed fact regarding whether she engaged in protected activity.  Plaintiff has not made such a
27 showing.  Title VII prohibits retaliation against a person because she "opposed any practice made an
28 unlawful employment practice" by Title VII or "because he has made a charge, testified, assisted, or

10

1   participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. §
2   2000e-3(a). An employee opposes an unlawful employment practice when she opposes
3   discrimination based on sex, race, color, religion, and national origin or she opposes what she
4   reasonably believes is discrimination based on these classes. Learned v. Bellevue, 860 F.2d 928, 932
5   (9th Cir. 1988) ("[T]he opposed conduct must fairly fall within the protection of Title VII to sustain
6   a claim of unlawful retaliation."); see also Lee v. Potter, Case No. 07-254 SBA, 2008 U.S. Dist.
7   LEXIS 76841, at *20-21 (N.D. Cal. Sept. 30, 2008) (finding that the plaintiff did not establish a
8   reasonable belief that she opposed discriminatory employment practices when she protested unfair
9   employment practice). Here, Defendant argues that only the "opposition" clause is implicated in this
10   case, not the "participation" clause, and Plaintiff does not dispute this distinction. Additionally,
11   there is no there is no evidence that Plaintiff "made a charge, testified, assisted, or participated in any
12   manner in an investigation, proceeding, or hearing" under Title VII prior to her termination. To the
13   extent Plaintiff argues she was a witness for her co-worker Williams, Williams did not initiate
14   contact with anyone involved with the EEO until June 9, 2008. (Carradero Decl. Ex. N, Williams
15   Dep. at 88.) Similarly, Plaintiff did not file an EEO complaint until June 13, 2008. (Carradero Decl.
16   Ex. A-41.)

17          Here, there is no evidence sufficient to raise a triable issue that Plaintiff opposed
18   discrimination based on a protected class or opposed conduct that Plaintiff reasonably could have
19   believed was based on a protected class. Plaintiff's claim is premised on her having repeatedly
20   objected to TK's "discriminatory harassment" of Williams and the "hostile work environment" he
21   created for Williams and Plaintiff. The Court must look behind these buzzwords, however, and
22   consider the substance of Plaintiff's complaints. Filippi v. Elmont Union Free Sch. Dist., Case No.
23   9-4675, 2012 U.S. Dist. LEXIS 139702, at *62 (E.D.N.Y. Sept. 27, 2012). None of the conduct
24   Plaintiff "opposed" involved unlawful discrimination based on any of the grounds prohibited by Title
25   VII. None of Plaintiff's communications with Yarbrough mentioned a protected class, such as race,
26   sex, or national origin, or conduct directed at someone because he or she was a member of one of
27   these classes. (Carradero Decl. Ex. CE-5, Ex. CE-6, CE -8, Ex. CE-9.) Plaintiff's May 28, 2013
28   meeting with Yarbrough involved Plaintiff's description of the incident where she allegedly "blew

United States District Court
For the Northern District of California

11

up" on TK and unspecified "ongoing daily retaliation" she suffered. (Carradero Decl. Ex. CE-9, Pl.'s Decl. ¶ 98.) Plaintiff opposed TK's uncivil and unprofessional behavior, but "[g]eneral claims of uncivilized behavior, unrelated to a person's status in a protected class, are not cognizable under Title VII." Filippi, 2012 U.S. Dist. LEXIS 139702 at *61.

Plaintiff testified that when TK made fun of Williams in the lunchroom using a Southern drawl and stereotypical Southern diction and syntax, she presumed that he did so because Williams was a "white woman from the South" and he implied that Williams was a redneck or racist. (Carradero Decl. Ex. E., Pl.'s Test. at 21-24, 36-37.) However, even when viewed in the light most favorable to Plaintiff, the reasonable inference is that TK was mocking Williams for being a Southerner. (Carradero Decl. Ex. C-10, Pl.'s 9/10/2008 Written Statement at 1.) Making fun of a Southern accent is not, however, race discrimination because "Southern-ness is not a protected trait." Williams v. Frank, 757 F. Supp. 112, 120 (D. Mass. 1991). Discrimination based on national origin is barred by Title VII; discrimination based on regional origin is not.

Additionally, although Plaintiff testified that there was some discussion in the lunchroom that TK was homophobic, discrimination based on sexual orientation alone, unlike gender, is not actionable under Title VII. In Oncale v. Sundowner Offshore Servs., where a male employee was physically assaulted in a sexual manner by other male co-workers and threatened with rape, id. at 77, the Supreme Court held that Title VII covered same-sex sexual harassment motivated by a general hostility toward a gender. 523 U.S. 75, 76, 80 (1998). Similarly, the Ninth Circuit has also held that gender stereotyping, including that based on same-sex stereotyping, is actionable. Rene v. MGM Grand Hotel, Inc., 305 F.3d 1061, 1068 (9th Cir. 2002) (Pregerson, J., concurring) (citing Nichols v. Azteca Restaurant Enter., 256 F.3d 864, 874-75 (9th Cir. 2001). However, discrimination on the basis of sexual orientation alone is not. See, e.g., Rene, 305 F.3d at 1063 (plurality on en banc review) ("We would hold that an employee's sexual orientation is irrelevant for purposes of Title VII. It neither provides not precludes a cause of action for sexual harassment."); id. at 1068 (Pregerson, J., concurring in result reached by plurality); DeSantis v. Pac. Tel. & Tel. Co., 608 F.2d 327, 329-39 (9th Cir. 1979) ("[W]e conclude that Title VII's prohibition of 'sex' discrimination applies only to discrimination on the basis of gender and should not be judicially extended to include sexual

1  preference such as homosexuality.").

2    Even if Plaintiff thought she was engaging in protected EEO activity, no rational jury could
3  find that Plaintiff had a reasonable belief that TK's actions violated Title VII. It does not matter that
4  Williams or Plaintiff's supervisors may have held the subjective, mistaken belief that sexual
5  orientation is protected. Rather the issue of "reasonableness" depends on the objective standard of
6  whether the conduct at issue targeted a member of a class covered by Title VII based on that statute.
7  A plaintiff might be able to maintain a retaliation claim where she opposed conduct that she
8  reasonably believed was based on membership in a class actually protected by Title VII, such as
9  harassment based on gender, but was mistaken because the conduct was not sufficiently pervasive.
10  A plaintiff cannot pursue a claim of retaliation, however, where the conduct opposed cannot violate
11  Title VII because it does not involve a class within the protection of the statute. Accordingly,
12  Plaintiff has not raised a triable issue that she engaged in a protected activity.

13    3.  *Pretext*

14    Moreover, even assuming that Plaintiff raised a genuine issue of fact regarding engaging in a
15  protected activity, Defendant has articulated legitimate, non-retaliatory reasons for terminating
16  Plaintiff, and Plaintiff has not provided "specific and significantly probative evidence" that
17  Defendant's proffered reasons are a pretext to raise a triable issue of fact on the issue. Defendant
18  provided evidence that Plaintiff's termination resulted from "improper and unauthorized actions that
19  Plaintiff took on the Roundtree file." (Flint Decl. ¶ 14.) Plaintiff does not dispute that she: (1) did
20  not promulgate the denial of the Roundtree claim; (2) solicited medical records regarding Roundtree
21  from New Directions; (3) and conducted research and drafted an analysis contrary to the rating
22  decision. This led to a several month delay in the processing of the claim. The actions Plaintiff took
23  on the file were outside the scope of her job, training, and experience. (Vallejos Decl. ¶ 7;
24  Yarbrough Decl. ¶ 13-14; Penning Decl. ¶ 27; Carradero Decl. Ex. K, Muraoka Dep. at 22-24, 35-37,
25  48; 55; Carradero Decl. Ex. J, Carlson Dep. at 31-32, 34, 37.)[3]

27  [3] Defendant also put forth as a secondary reason for Plaintiff's termination that her productivity
was declining and she was not reaching the four actions per day deadline required at six months on the
28  job. Plaintiff does not dispute that she was below that productivity standard but argues it should be
ignored because she was a few weeks short of six months when she was fired. Her argument is
insufficient to raise a triable issue of pretext, especially because the primary, overriding reason for her

1   A plaintiff can establish pretext on summary judgment directly by showing that the employer
2 was motivated by an improper purpose, or indirectly by showing that the explanation is unworthy of
3 credence. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). In assessing whether
4 a proffered justification is "unworthy of credence," courts "only require that an employer honestly
5 believed its reasons for its actions, even if its reason is foolish or trivial or even baseless."
6 Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002). Pretext may also be
7 shown by shifting, conflicting reasons for an adverse action; however, when different reasons are
8 given for an adverse action that are not incompatible, they do not raise a triable issue of pretext.
9 Nidds v. Schindler Elevator Corp., 113 F.3d 912, 918 (9th Cir. 1996.)

10   Plaintiff has not presented evidence that Defendant was motivated by an improper purpose
11 sufficient to raise a triable issue of fact. At most, Plaintiff argues that Yarbrough's May 29, 2008
12 email demonstrates retaliatory motive. (Carradero Decl. Ex. CE-9.) In this email, Yarbrough stated
13 that "Ms. Fox intends to file a complaint against [TK] eventually. I did speak to Uli [Willimon]
14 yesterday, and once I receive the memo from Tina, I will put together a package so we can move
15 forward with proposing to remove Ms. Fox, as that is Uli's intent." The final decisionmaker, Flint,
16 was not sent a copy of this email, however, and there is no evidence that she was aware of it.
17 Moreover, it came after Plaintiff's supervisors had unanimously agreed to recommend to Flint that
18 Plaintiff be terminated, which occurred by May 28, 2013. See, e.g., Clark Cnty. Sch. Dist. v.
19 Breeden, 532 U.S. 268, 271-72 (2001) (holding that it was immaterial that plaintiff's transfer
20 occurred after she filed her lawsuit because management was "contemplating" the transfer before it
21 learned of the suit).

22   Plaintiff has also not raised a triable issue that Defendant's primary reason for firing Plaintiff
23 – failure to follow instructions regarding the Roundtree file – is unworthy of credence. Plaintiff
24 argues that her termination was meritless because, with the except of the internet research, her

25

26 termination was her improper activity on the Roundtree file. For example, Flint stated she would not
27 have terminated Plaintiff based on her performance alone; rather it was her actions regarding Roundtree
that resulted in her termination. (Flint Decl. ¶ 14.) Further, although management initially considered
28 finding that Plaintiff also committed a privacy violation but ultimately did not cite that in her termination
letter, Defendant's privacy concern regarding Roundtree is related to and consistent with the charge that
Plaintiff failed to follow instructions.

1   actions regarding the Roundtree file were made at the direction of mentors, trainers, and supervisors

2   and she cannot be fired for acting under orders.  Plaintiff testified in her EEO proceeding that she

3   showed the yellow piece of notebook paper in the file to Angel Cuevas and Dan Muraoka.  (Pl.'s

4   Decl. Ex A-2, Pl.'s Dep. at 46, 111-112.)  Cuevas testified that he remembers talking about

5   Roundtree and seeing the piece of paper.  (Carradero Decl. Ex. G, Cuevas Test. at 789-91.)  Plaintiff

6   also testified at the EEO proceeding that Cuevas knew she was contacting New Directions, although

7   she testified at her deposition that she could not recall who told her to solicit medical information.

8   (Carradero Decl. Ex. E, Pl.'s Test. at 112-12; Ex. A, Pl.'s Dep. at 175, 182, 206-07.)  Moreover,

9   Sherb Carlson testified that in February or March 2008, Plaintiff left the Roundtree file with him and

10   mentioned that there was something unprofessional about it.  (Carradero Decl. Ex. J, Carlson Dep. at

11   85-87.)  Plaintiff also testified vaguely and speculatively that someone must have been giving her

12   instructions and guidance, because in contacting New Directions she performed actions that, based

13   on her training, she would not have known how to perform without guidance.  (Ex. A, Pl.'s Dep. at

14   206.)[4]  Although Plaintiff's evidence raises an issue of fact regarding whether she sought some

15   guidance from her supervisors, the material factual question is whether Plaintiff was instructed by

16   her supervisors to re-open the inquiry into a claim that had been denied or to continue to pursue her

17   investigation by requesting the file be retrieved after it was in storage and then diverted to her friend

18   Williams.  There is insufficient evidence to raise a genuine dispute of fact on this material issue.

19      Viewing the evidence in the light most favorable to Plaintiff and drawing inferences in her

20   favor, the Court cannot find that she has adduced specific and significantly probative evidence that

21   Defendant had an improper motive for firing Plaintiff.  Plaintiff concedes that she did not promulgate

22   Roundtree's claims, acted beyond her training, performed independent research, and disagreed with

23   the rating the claim file was given.  Plaintiff's general, unspecific testimony that she sought guidance

24   from her supervisors regarding the Roundtree file does not raise a triable issue that Defendant's

25   reason for terminating Plaintiff was a pretext.

26

27

28

---

[4] Although much of Plaintiff's evidence is contradicted by testimony and declarations from Plaintiff's supervisors, the Court does not weigh evidence on summary judgment.

United States District Court
For the Northern District of California

**III.     Conclusion**

No reasonable jury could find that Plaintiff engaged in a protected activity or that Defendant's reason for terminating Plaintiff was a pretext for retaliation. The Court grants Defendant's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: Aug 6, 2013

ELIZABETH D. LAPORTE
United States Chief Magistrate Judge

United States District Court
For the Northern District of California

16